## KELBLE OPERATING CORPORATION v. JARKA CORPORATION.

### No. 307.

Circuit Court of Appeals, Second Circuit.

May 2, 1938.

Thomas A. McDonald, of New York City (Thomas A. McDonald, of New York City, Joseph V. Costa, of Brooklyn, N. Y., and I. J. Copperman, of counsel), for appellant.

Clark, Carr & Ellis, of New York City (Paul A. Crouch, of New York City, of counsel), for appellee.

Before MANTON, AUGUSTUS N. HAND, and CHASE, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge.

This is an appeal from a judgment entered on a verdict directed by the court for the defendant in an action at law begun by the plaintiff to recover commissions from the defendant pursuant to an alleged contract, at the rate of 5 cents per gross ton on raw sugar unloaded by the defendant from steamers at Norfolk, Va. Under the contract between the defendant and the plaintiff the former is alleged to have agreed to pay the commissions on such sugar in consideration for the promise of the latter to refrain from soliciting future stevedoring business from Farr & Co., whose cargoes were to be unloaded.

The action was tried before a jury of one under a stipulation that at the conclusion of the case each party should move for the direction of a verdict and that no findings of fact or conclusions of law should be made. Each side moved for such direction and the court, after reserving decision on the motions, filed an opinion discussing the issues between the parties and directing a verdict in favor of the defendant. From the judgment entered on this verdict the plaintiff has appealed.

The plaintiff and defendant are each corporations engaged in the stevedoring business. One George Kelble had been in the employ of the defendant for some ten years prior to June, 1934, when he left its employ and, on June 13, 1934, organized the plaintiff Kelble Operating Corporation, of which he became president. In Jan-

uary, 1934, Kelble, at that time in the employ of the defendant to solicit business, arranged a contract between Farr & Co. and the Jarka Corporation whereby Jarka agreed to stevedore the vessels of Farr & Co. at certain prescribed rates, the cargoes consisting of raw sugar. The agreement by its terms was subject to cancellation upon thirty days' written notice. It fixed rates for stevedoring of vessels loading and discharging at Norfolk, Va., only.

Shortly after Kelble left the employ of the defendant he asked Leon H. Ackerman, who was in charge of the defendant's stevedoring at Norfolk, to call at his office in New York. Ackerman called and there was a conference between Kelble and himself at which a man named Marine, described as manager of the raw sugar department of Farr & Co., was present. Crosby, plaintiff's vice president, testified that on June 21, 1934, he was told by Kelble, in the presence of Ackerman and Marine, that an agreement had been reached with the Jarka Corporation "whereby the Kelble Corporation was to receive five cents per ton on every ton of sugar going into warehouse at Norfolk, Virginia, and five cents a ton on every ton of sugar coming out of warehouse at Norfolk, in return for which the Kelble Corporation would cease any effort to secure Farr & Company's business at Norfolk. Captain Ackerman said he thought that was a very fine thing for both companies; that he had been over to Captain Jarka, and that Captain Jarka had approved the plan, and that it would eliminate cut-throat competition down there, and that probably the Kelble Corporation and Jarka would both make just as much money out of that arrangement as they would under any other arrangement." Crosby said he was also told that Marine remarked that: "he thought it was a good thing for both companies." Crosby added as a further summary of the arrangement related to him by Ackerman in the presence of Kelble and Marine that the payments were to be made to the plaintiff "progressively as the ships were discharged or loaded at Norfolk" and were "to continue *. * * indefinitely during the life of the contract, that was then existing between Farr and Jarka; and new arrangements were to be made in the event a new contract was made."

Ackerman testified that at the conversation with Kelble on June 21, 1934, Kelble said: "Farr & Company were going to give him all their business up and down the Coast. * * *" Ackerman added that: "Mr. Marine was there, and Mr. Marine made a remark that he hoped that Kelble and myself could get together, because our contract had a thirty day cancellation clause in it, and it could be cancelled. I took that to mean a threat that if we did not get together with Kelble, the contract would be cancelled."

Ackerman also testified that at a second conference on the same day at which the same persons were present and also Crosby: "I came back and told them that I had told our company that apparently unless we agreed on the commission, we would probably lose Farr & Company's business, and that I had authority to negotiate the thing further with them; so then we discussed the details of the commission, how much it would be, and what would be satisfactory; and then we agreed on five cents a ton." Ackerman also testified that he could not say that "anything definite was said" at the conference about Kelble Operating Corporation competing with Jarka, "but the fact that he was in the stevedoring business would mean that he would compete * * * with us."

On June 22, 1934, on the day after the foregoing interviews, a letter was sent to Kelble Operating Corporation by the Jarka Corporation signed on their behalf by Ackerman which, so far as relevant to the present discussion, was as follows:
"Gentlemen:—

"In view of the fact that arrangements for handling Farr & Co. business will in the future be made thru The Kelble Operating Corporation, it is understood and agreed that a commission of five cents per gross ton will be paid to the Kelble Operating Corporation by The Jarka Corporation on any Cuban Raw Sugar which is discharging from steamers and stored in the warehouse at Norfolk under our existing contract. * * * It is also understood that a commission of five cents per gross ton will be paid on sugar moving out of warehouse and loaded into steamers. This commission is based on the present stevedoring rate specified in our existing contract with Farr & Co. * * *

"In the event a new contract is made by Farr & Co. with The Jarka Corporation for additional future business, the commission to be paid to The Kelble Operating

Corporation on this new business will be mutually agreed upon."

Whitlock, a member of the firm of Farr & Co., testified about a conference with Kelble and Ackerman, at which Marine was present. He said that no employee of his firm had any authority to negotiate an arrangement for commissions on their business, that the Kelble Operating Corporation had never negotiated contracts between Jarka and Farr & Co. or attempted to solicit any work for Farr & Co. at Norfolk, and that the recital in the letter of the corporation signed by Ackerman that "arrangements for handling Farr & Co. business will in the future be made through the Kelble Operating Corporation" was without foundation. While Whitlock knew that Farr & Co. sent copies of their correspondence with the Jarka Corporation during the summer of 1934 to Kelble Operating Corporation as to sugar loaded and unloaded at Norfolk and that Kelble at times came into their office to talk about Norfolk matters, he supposed these communications were because Kelble had a personal claim against the Jarka Corporation for commissions based on what he had done as freight solicitor before he left Jarka. Whitlock testified that, when he discovered that Kelble Operating Corporation was making a claim for commissions for negotiating Norfolk business, he told Kelble that: "if there was any commission on this business it was coming to Farr & Company. We were not accustomed to have somebody horn in between us and our principal or another stevedore."

On September 8, 1934, Ackerman delivered a check of Jarka Corporation for $207.49 to Kelble Operating Corporation representing commissions of the latter then accrued on sugar transactions at Norfolk. Later a letter from the Jarka Corporation signed by Ackerman was received by Kelble Operating Corporation, though it seems to have been dated September 4, 1934. It quoted the statement in the letter of June 22, 1934, which outlined the agreement to pay a commission of 5 cents per gross ton made: "In view of the fact that arrangements for handling Farr & Co. business will in the future be made thru The Kelble Operating Corporation," and went on to say:

"After discussing this matter with Mr. Whitlock and Mr. Shelton Farr of Farr & Company, we find that this arrangement was not made with their knowledge and consent and that it was not their desire that Farr & Company's business at Norfolk be handled through the Kelble Operating Corporation.

"We believe that when you asked us for this commission arrangement it was due to a misapprehension on your part. Accordingly, we have to advise you that we will pay you no commission on any business which we handle at Norfolk for the account of Farr & Company, nor can we enter into any arrangements respecting Farr & Company's business except directly with them.

"We assure you that the action we have taken in declining to pay this commission to you is entirely satisfactory to Farr & Company."

The complaint alleged that: "on or about the 22nd day of June, 1934, * * * the plaintiff entered into an agreement with the defendant wherein * * * the plaintiff agreed to refrain from soliciting future stevedoring business at Norfolk of Farr & Company * * *, and agreed to negotiate and handle any future business contracts which defendant may have with said Farr & Company at Norfolk, on behalf of defendant. * * * That in consideration thereof, the defendant agreed to pay to the plaintiff a commission of five cents per gross ton on all sugar * * * discharged from steamers and stored in warehouses at Norfolk, or taken from warehouse and shipped from Norfolk, Virginia, by defendant for the account of Farr & Company. * * *" The complaint went on to allege that the plaintiff had refrained from soliciting any of the business of Farr & Co. at Norfolk and that there was due a balance of $9,792.51 on account of unpaid commissions.

The answer denied the above allegations of the complaint and set up as separate defenses: (1) That the plaintiff had represented to the defendant that it had been appointed by Farr & Co. its exclusive agent in negotiating contracts with respect to stevedoring and handling sugar for their account, but that such representations when made were known by the plaintiff to be untrue; (2) that the representations were made in the belief that they were true but through mutual mistake.

When each side moved for the direction of a verdict and the court made a direction for the defendant, we must affirm if there be any evidence in support

of the conclusions of law. Beuttell v. Magone, 157 U.S. 154, 15 S.Ct. 566, 39 L.Ed. 654; Halsband v. Columbian Nat. Life Ins. Co., 2 Cir., 67 F.2d 863, 864.

In the memorandum setting forth grounds for directing a verdict for the defendant, the reasons given were principally: (1) That the agreement lacked mutuality and consideration in that the arrangement could be terminated by the plaintiff at any time by its solicitation of Farr & Company's business at Norfolk; and (2) that "the plaintiff threatened to destroy the existing agreement between the defendant and Farr & Co. unless a commission was paid to the plaintiff."

In connection with the second ground for holding the contract invalid, the court said: "There seems to be bad faith on the part of the plaintiff almost amounting to fraud. The plaintiff made a representation to the defendant that Farr & Co. had appointed it their authorized agent. Plaintiff led the defendant to believe that Farr & Co. was ready to cancel their agreement with the defendant unless a commission was paid by the defendant to the plaintiff. The plaintiff was cognizant of the fact that a valid subsisting contract existed between the defendant and Farr & Co. This agreement had been in effect for quite some time. With full knowledge of this contract and for purely selfish purposes, the plaintiff threatened to destroy the existing agreement between the defendant and Farr & Co. unless a commission was paid to the plaintiff. This was a wrongful act and the plaintiff should not be permitted to make a substantial gain thereby."

There seems to have been ample evidence to support the court's statement that the plaintiff falsely represented that Farr & Co. had appointed it their authorized agent. The making of such a representation was borne out by oral testimony as well as confirmed by the recital in the letter of defendant to the plaintiff of September 4, 1934, and the representation was plainly false. While the attempt to nullify the agreement for fraud might have had a substantial basis, we think it cannot succeed because, on September 8, 1934, the defendant waived any right to rescind on that ground when it delivered the check for $207.49 on account of commissions to the plaintiff. Likewise the conclusion of the court that the action to recover commissions must fail, because plaintiff "threatened to destroy the exist-

ing agreement between the defendant and Farr & Co. unless a commission was paid, * * *" is hardly justified on the theory that the defendant threatened to commit a tort. It might be sound if the plaintiff had threatened to cause the breach of the agreement between defendant and Farr & Co., but its threat was perhaps no more than one to get the stevedoring work of Farr & Co. after persuading them to cancel their existing contract with the Jarka Corporation through the exercise of their option under the thirty-day clause.

We think, however, that the court properly directed the verdict on the ground that the promise to pay commissions lacked consideration. The letter of June 22, 1934, may reasonably be thought to embody the arrangement between the parties. It contains nothing about not competing for the business of Farr & Co., and Ackerman testified that he could not say that anything definite was said at their conference about that subject. He realized that the fact that Kelble "was in the stevedoring business would mean that he would compete," but said: "I don't remember him making any threat to compete with us."

It seems a fair interpretation of the dealings between the parties that Kelble led the defendant to suppose that Farr & Co. were going to give him all their business up and down the Coast" (folio 136). Marine, the general manager of the raw sugar department of Farr & Co., and a friend of Kelble who had been offered an interest in the latter's company, was present at the interview between Kelble and Ackerman to remind the latter that the existing contract between the defendant and Farr & Co. could be canceled in thirty days. Ackerman quite naturally "took that to mean a threat that if we did not get together with Kelble the contract would be cancelled." Under such circumstances the defendant thought it best to pay a commission in order to keep Kelble Operating Corporation from carrying out its threat to get the business away from the Jarka Corporation. The memorandum of June 22, 1934, which Ackerman sent to the plaintiff, contained no provision that Kelble Operating Corporation was not to compete, and we can hardly think that an item so important would have been omitted if the arrangement involved more than a bare promise by the defendant to pay commissions. There was proof on which a verdict might be founded

that there was no promise not to compete and that there was not even a request not to compete in exchange for the promise to pay commissions. There was nothing but a veiled threat of loss of future business followed by a promise to pay so-called commissions to forestall a possible loss. That promise was repudiated after the defendant learned from Farr & Co. that the danger of losing their business did not exist and that the basis for paying any commission to the plaintiff was illusory. Whether an agreement not to compete would have been against public policy under the particular facts here we need not decide.

Judgment affirmed.